IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 11-227 |
| JAMAR BLACKSHEAR ET AL. | : | |

**SURRICK, J.**                                                                                      **OCTOBER  28 , 2011**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendants Jamar Blackshear and Terrell Davis's Motion to Suppress Physical Evidence, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). (ECF Nos. 41, 47.) For the following reasons, the Motion will be denied.

**I.      BACKGROUND**

On April 13, 2011, a grand jury returned an indictment charging Defendants each with one count of possession with intent to distribute, and aiding and abetting the possession with intent to distribute, approximately 740 grams of a mixture and substance containing cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2; and one count of possession of, and aiding and abetting the possession of, a firearm in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. §§ 924(c)(1) and (2). (ECF No. 20.) On May 12, 2011, Defendants entered pleas of not guilty on both counts. (ECF Nos. 23, 24.)

On July 11, 2011, Blackshear filed a Motion to Suppress Physical Evidence (Blackshear Mot., ECF No. 41), and on August 3, 2011, Davis joined in that Motion and adopted the factual and legal arguments contained therein (Davis Mot., ECF No. 47). Davis also filed a separate memorandum of law in support of his Motion to Suppress. (Davis Br., ECF No. 47.) The

Government responded to the Motion on August 19, 2011.  (Gov't's Resp., ECF No. 52.)[1]

A suppression hearing was held on September 6, 2011 and on September 9, 2011.  (Min. Entries, ECF Nos. 58, 69.)  At the September 6 hearing, we heard testimony from Philadelphia police officers Clifford Gilliam and Shawn Witherspoon of the Eighteenth Police District.  Both officers were involved in the arrest of Defendants on January 21, 2011.  (Sept. 6 Hr'g Tr. 7-10, 81-83, ECF Nos. 65-66.)  At the conclusion of the September 6 hearing, we granted defense counsel's request for additional time to locate the rental vehicle in question to determine whether the driver's side window closest to the front of the vehicle was tinted.  (*Id.* at 127-28.)[2]  At the September 9 hearing, we had the opportunity to observe a Jeep Cherokee that had been brought to the holding area of the courthouse.  (Sept. 9, Hr'g Tr. 23, Sept. 9, 2011, ECF Nos. 71-72.)  Mark Moscatelli, the Risk Manager for Enterprise Leasing Company, the owner of the vehicle, confirmed that this Jeep Cherokee was the rental vehicle that had been leased by Defendant Blackshear.  (*Id.* at 6-12.)  At the September 9 hearing, we also heard testimony from defense witness Keith Festus, owner of Double Connect Wireless (*id.* at 4-5, 27), and Government witnesses Special Agent Rob Cucinotta of the Bureau of Alcohol, Tobacco, Firearms and Explosives and Detective Robert Conway of the Southwest Detectives of the Philadelphia Police

---

[1] On September 2, 2011, the Government filed a supplemental response to Defendants' Motion to Suppress.  (ECF No. 55.)

[2] Blackshear's counsel advised the Court that in view of the photographs taken of the vehicle on January 21, 2011 and his understanding of the facts of the case, he expected the officers to concede that the side windows closest to the front of the vehicle were tinted.  He advised that he was "stunned" that the officers did not take that position.  As a result, counsel requested the opportunity to locate the vehicle.  (Sept. 6 Hr'g Tr. 127.)  We continued the suppression hearing until September 9, 2011.  (*Id.*)

Department (*id.* at 78-79, 101).³  At the conclusion of the September 9 hearing, we granted defense counsel the opportunity to submit additional evidence with regard to the Jeep Cherokee no later than September 23, 2011.  (*Id*. at 105; Sept. 9 Order, ECF No. 70.)  On September 26, 2011, counsel for Davis submitted a letter advising that Davis would not be presenting any additional evidence concerning the Jeep Cherokee because the records obtained from Enterprise contained no pictures depicting the areas of the vehicle at issue here.  (Ltr., Sept. 26, 2011 (on file with Court).)  Blackshear's counsel submitted no additional evidence.

## II.   FINDINGS OF FACT

Clifford Gilliam is a Philadelphia police officer who has been assigned to the Eighteenth District of the Philadelphia Police Department for four years.  (Sept. 6 Hr'g Tr. 8.)  On January 21, 2011, Officer Gilliam was on vehicle patrol on the 5100 block of Market Street ("5100 Block") in Philadelphia.  (*Id*. at 10.)  At the time, the 5100 Block was a high-crime area where robberies, thefts and hand-to-hand narcotics trafficking occurred on the streets, and in vehicles parked on the streets, at all hours of the day.  (*Id.* at 8-9, 82; *see also* Sept. 9 Hr'g Tr. 30.)  Officer Gilliam's partner, Shawn Witherspoon, also an officer in the Eighteenth District for the last four years, was on foot patrol in that area at that time.  (Sept. 6 Hr'g Tr. 10-11, 81.)  Officer Gilliam picked up Officer Witherspoon, then parked his marked patrol car in the middle of the 5100 Block.  (*Id.* at 10-11.)  Both officers were in full uniform.  (*Id.* at 10, 84.)

---

³ For a number of reasons, we did not find the testimony of Keith Festus particularly credible.  Unlike the police officers, his testimony was, at times, tentative.  Moreover, Defendant Blackshear was a customer at his store.  Festus was attending to customers while at the same time observing this incident.  Festus frequently sees incidents like this in his neighborhood.  They are common occurrences.  The testimony of Mr. Festus simply did not inspire one with confidence.

At 1:30 p.m., minutes after parking the patrol car, Officer Gilliam saw Defendants sitting in a black Jeep Cherokee, license plate number HRX0568 ("Jeep"), parked across the street. (*Id.* at 11-12; Police Report, Blackshear Fact Findings Ex. A, ECF No. 74.) The Jeep was parked on the north side of Market Street, facing westbound, and was approximately one traffic lane's width from the parked patrol car. (Sept. 6 Hr'g Tr. 42, 54, 85.) Blackshear was in the driver's seat, and Davis was in the front passenger seat of the Jeep. (*Id.* at 12-13.) The Jeep was not illegally parked, and the engine was running. (*Id.* at 44, 86.) The Jeep had three windows on each side. On the driver's side, the two side windows closest to the rear of the vehicle were tinted. The side window closest to the front of the Jeep was not tinted. (*Id.* at 15-16; Gov't Hr'g Ex. 2.)[4]

Looking directly into the Jeep, Officer Gilliam witnessed through the side window closest to the front of the driver's side Defendants Blackshear and Davis speak with and then reach

---

[4] The Jeep Cherokee that was produced at the September 9, 2011 hearing had tint on all of the side windows, including the driver's and passenger's side windows closest to the front of the vehicle. (Sept. 9 Hr'g Tr. 8, 22-26.) If the Jeep on January 21, 2011 had been in the same condition as the Jeep Cherokee that was produced at the September 9, 2011 hearing, one would not have been able to see into the vehicle and ascertain any facial expressions of the vehicle's occupants sitting in the front driver and front passenger seats. Mark Moscatelli of Enterprise Leasing, the rental company that owns the Jeep, testified that the manufacturer of the vehicle and Enterprise Leasing did not put the tint on the front driver's or front passenger's side windows. (*Id.* at 12-13.) Moscatelli also testified that "probably 50 or 60 people, maybe more, [] rented the vehicle after Mr. Blackshear" and that any one of these persons could have added the tint to these windows. (*Id.*) Moscatelli noted that there were photographs of the Jeep shortly after Defendants' involvement with it. (*Id.* at 16-18.) We gave Defendants the opportunity to present additional evidence with regard to the tint on the windows of the Jeep on January 21, 2011, including the photographs mentioned by Moscatelli. Defendants have not submitted further evidence on this matter. (*Id.* at 105; Sept. 9 Order; Ltr., Sept. 26, 2011.) Accordingly, in light of the lack of any evidence that the condition of the Jeep on January 21, 2011 was the same as the condition of the Jeep as produced at the September 9, 2011 hearing, we find that the testimony of Officers Gilliam and Witherspoon that the side window closest to the front of the Jeep on the driver's side was not tinted on January 21, 2011 was credible.

toward each other.  Although Officer Gilliam could not see the Defendants' hands or determine whether they held anything in their hands, he concluded based upon his experience that their body motions were consistent with the exchanging of narcotics in a narcotics transaction.  (Sept. 6 Hr'g Tr. 17-18.)  At the time, Officer Witherspoon was doing paperwork and did not look in the direction of the Jeep.  (*Id.* at 87.)  After Officer Gilliam alerted Officer Witherspoon that he believed a narcotics transaction was taking place in the Jeep, Officer Witherspoon looked at the vehicle and both officers observed Defendants staring at the patrol car with expressions of shock on their faces.  (*Id.* at 20, 87-88.)

Defendants quickly reached toward the back seat of the Jeep.  Based on Officer Gilliam's experience, the reaching motions were consistent with a tossing motion.  (*Id.* at 22-23, 89-90.)  Although the officers could not see Defendants' hands as they reached toward the back seat, Officer Witherspoon saw their hands after Defendants finished their reaching motion and did not see anything in their hands.  (*Id.* at 90.)

Defendants exited the Jeep.  Blackshear quickly opened the driver's side door, departed from the Jeep and began briskly walking eastbound on Market Street.  He did not pause to close the driver's side door, which was left partially open.  (*Id.* at 24-25, 90-91.)  In the meantime, Davis quickly exited from the passenger side of the Jeep and walked eastbound.  (*Id.* at 91.)  Defendants were hurried in their exit from the Jeep.  (*Id.* at 25.)

Officer Gilliam intercepted Blackshear near the rear of the Jeep as he briskly walked eastbound on Market Street.  Gilliam proceeded to stop Blackshear and requested that he place his hands on the Jeep.  Gilliam then patted Blackshear down to determine whether he had any weapons on his person.  (*Id.* at 26-27.)  At this point, Officer Gilliam was not placing Blackshear

under arrest, but rather was detaining him for investigation. He was free to leave depending on the results of the investigation. (*Id.* at 36.) Officer Gilliam asked Blackshear why he was on the 5100 Block. Blackshear responded that he was going to a cellular telephone store. (*Id.* at 29.) Based on his experience and training, and in view of Officer Gilliam's observations of the reaching motions inside the Jeep, Blackshear's hurried exit from the Jeep after he saw the officers, and the fact that Blackshear left the front door of the Jeep partially open upon leaving the vehicle, Gilliam did not find Blackshear's response credible. (*Id.*) While patting down Blackshear, Officer Gilliam felt a large bulge in Blackshear's pants pocket. (*Id.* at 27-28.) Based on his prior experience, Officer Gilliam thought that the bulge felt like a wad of money. (*Id.* at 28.) Officer Gilliam knew that a large amount of currency on one's person was consistent with the sale of narcotics, given that narcotics transactions and exchanges are a cash business. (*Id.* at 28-29.) Officer Gilliam did not find any weapons on Blackshear. (*Id.* at 28.)

Meanwhile, as Officer Gilliam was intercepting and patting down Blackshear, Officer Witherspoon intercepted Davis near the rear of the Jeep as Davis walked eastbound on Market Street. (*Id.* at 92-93.) At the time, Davis's hands were empty, but Officer Witherspoon observed a large bulge in Davis's pants pocket. (*Id.* at 93.) Based upon his observations of the Defendants in the Jeep, considering the fact that they were in a high-crime area, and considering Defendants' quick departure from the Jeep and the large bulge in Davis's pocket, Officer Witherspoon decided to pat down Davis for his own safety. (*Id.* at 94-95.) Officer Witherspoon determined that the bulge in the pocket felt like a wad of money. (*Id.* at 94-95, 118.) Based on his experience, Witherspoon knew that a large wad of cash on one's person is consistent with narcotics trafficking. He also knew that weapons or firearms and narcotics go together. (*Id.* at

95.) Officer Witherspoon subsequently placed Davis in the back of the patrol car but did not handcuff him. (*Id.* at 95-96.) At this point, Davis was not under arrest, but rather was being detained while the officers conducted their investigation. Depending on the results of the investigation, Davis would be free to leave. (*Id.* at 96.)

After placing Davis in the patrol car, Officer Witherspoon walked back to the Jeep. The driver's side door was three feet ajar. (*Id*. at 96-97, 101.) Because the Jeep's two side windows closest to the rear of the vehicle were tinted, Officer Witherspoon could not determine whether anyone remained inside the Jeep. Officer Witherspoon was concerned that anyone inside the Jeep could be armed and could be a threat to the officers' safety. (*Id.* at 96-100.) Officer Witherspoon pushed the front driver's side door open further so that he could see more clearly into the rear of the vehicle to determine whether there were other occupants in the vehicle. (*Id.* at 100-01.) When Officer Witherspoon looked into the vehicle, he observed a silver and black handgun wedged between the driver's seat and the middle console. The gun was in plain view. Officer Witherspoon could see the gun as he stood outside of the vehicle. (*Id.* at 97, 102.)[5] Neither Defendant indicated that he had a permit to carry the firearm. (*Id.* at 32.)

After he saw the handgun, Officer Witherspoon instructed Officer Gilliam to arrest Blackshear and place him in handcuffs. (*Id.* at 31-32, 102.) Incident to this arrest, Officer Gilliam searched Blackshear and recovered $2,400.00 from his pants pocket. He put Blackshear in handcuffs and then placed him in the back of the patrol car. (*Id.* at 31-32.) Officer Gilliam

---

[5] Davis points to various discrepancies in the officers' accounts of the events in question, including that Officer Gilliam's signed statement declares that "I went to the vehicle and observed a black handgun sitting *on top of* the driver's seat near the base of the seatbelt," (Davis Proposed Findings ¶ 33, ECF No. 75 (original emphasis); Sept. 6 Hr'g 33.) These discrepancies are insufficient to discredit the officers' testimony.

then returned to the Jeep and recovered the gun that had been observed inside of the vehicle.  (*Id.* at 32-34.)  Officer Gilliam unloaded the gun.  (*Id.* at 102.)

After the gun was unloaded and Defendants were secured, Officer Witherspoon examined the rear of the Jeep, where Defendants had directed their reaching motions, to determine whether firearms were located in that area.  Observing from the front seat of the vehicle, Officer Witherspoon saw in the rear a clear plastic shopping bag.  (*Id.* at 103.)  The top of the bag was open, and Officer Witherspoon observed what appeared to be cocaine in the bag.  (*Id.* at 103-04; Gov't Hr'g Ex. 3.)  Neither Officer Witherspoon nor Officer Gilliam touched or moved the bag. (Sept. 6 Hr'g Tr. 35, 104.)

The officers then called for a drug sniffing K-9 to determine whether narcotics were present in the Jeep.  (*Id*. at 35, 104.)  Meanwhile, Defendants were transported to the Eighteenth District.  (*Id.* at 104.)  The K-9 officer and dog arrived, and the dog alerted positive for the presence of narcotics inside of the Jeep.  (*Id.* at 36, 105.)

Philadelphia police officers secured the Jeep until a warrant was obtained to search the vehicle.  (*Id.* at 36; Sept. 9 Hr'g Tr. 103.)  At 6:10 p.m. that day, Philadelphia police detectives Robert Conway and Matthew Farley arrived at the 5100 Block with a warrant to search the Jeep. (Sept. 9 Hr'g Tr. 103-04; *see also* Prob. Cause Affidavit ¶ 9.)  By the time the detectives arrived at the 5100 Block, it was dark.  The sun had set at 5:07 p.m. on that day.  (Sept. 9 Hr'g Tr. 87, 102.)  The items recovered from the rear of the Jeep as a result of executing the search warrant were two plastic shopping bags containing a total of nine clear plastic sandwich bags all containing cocaine, ten cellular phones, a pair of binoculars and paperwork, including a vehicle lease agreement in the name of Blackshear.  (Prob. Cause Affidavit ¶ 9, Blackshear Br. Ex. A,

8

ECF No. 49-1; Marano Dep. 7-9, Apr. 13, 2011, Blackshear Br. Ex. B, ECF No. 49-1.)

Police Officer Clifford Gilliam and Police Officer Shawn Witherspoon were both credible witnesses.

### III. CONCLUSIONS OF LAW

Defendants move to suppress all physical evidence seized from the Jeep on January 21, 2011 as the fruit of an illegal search and seizure. (Blackshear Br. 4; Davis Br. 3.) The Government responds that Officers Gilliam and Witherspoon had reasonable suspicion to detain Defendants, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), that the officers had probable cause to search the Jeep, that the search warrant had sufficient factual basis to establish probable cause and that accordingly, the Motion should be denied. (Gov't's Resp. 4-13.) The Government also asserts that Defendants have not established their standing to challenge the search of the Jeep since neither Defendant has contended that they had a reasonable expectation of privacy in the vehicle. (*Id*. at 3-4.)[6]

#### A. Defendants Have Standing to Challenge the Search of the Jeep

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. A defendant must have standing to invoke the Fourth Amendment's exclusionary rule. *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010).[7] "Fourth Amendment standing

---

[6] On September 8, 2011, following the September 6 hearing, the Government submitted additional argument addressing why the Government believes that Davis, a mere passenger in the Jeep, lacks standing to challenge the officers' search of the vehicle. (Ltr., Sept. 8, 2011 (on file with Court); Sept. 6 Hr'g Tr. 6.)

[7] The Third Circuit recently clarified that although the right to challenge a search on Fourth Amendment grounds is often referred to as "standing," that right "is more properly placed

requires that the individual challenging the search have a reasonable expectation of privacy in the property searched . . . and that he manifest a subjective expectation of privacy in the property searched." *Kennedy*, 638 F.3d at 163 (internal quotation marks and citations omitted); *see Minnesota v. Olson*, 495 U.S. 91, 95 (1990) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (internal quotation marks and citation omitted). With regard to the objective prong, "we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Bond v. United States*, 529 U.S. 334, 338 (2000) (internal quotation marks omitted). With regard to the subjective prong, "we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.'" *Id*. (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

By lawfully renting the Jeep from Enterprise Leasing and driving the vehicle, Blackshear exercised substantial control over the vehicle and had a legitimate expectation of privacy in the vehicle. (Sept. 9 Hr'g Tr. 6; Prob. Cause Affidavit ¶ 9; Marano Dep. 7-9); *see United States v. Baker*, 221 F.3d 438, 442-43 (3d Cir. 2000) (finding that a person who lawfully borrows and exercises substantial control over a vehicle may have a legitimate expectation of privacy in it for purposes of standing); *see also United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001) ("A

---

within the purview of the substantive Fourth Amendment law than within that of standing." *United States v. Kennedy*, 638 F.3d 159, 163 (3d Cir. 2011) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). Thus, "standing to challenge a search is not a threshold issue that must be decided before reaching the question of whether a search was or was not constitutional." *Id.*; *see also United States v. Varlack Ventures, Inc.*, 149 F.3d 212, 215-16 (3d Cir. 1998) (assuming, without deciding, standing to challenge search).

person listed as an approved driver on a rental agreement has an objective expectation of privacy in the vehicle due to his possessory and property interest in the vehicle."). Blackshear has standing to challenge the officers' search of the Jeep.

"Passengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding" since they lack a reasonable expectation of privacy in a vehicle that they neither own nor control. *United States v. Mosley*, 454 F.3d 249, 252-53 (3d Cir. 2006); *see also Baker*, 221 F.3d at 441-42 ("It is clear that a passenger in a car that he neither owns nor leases typically has no standing to challenge a search of the car."). However, "passengers in an illegally stopped vehicle have 'standing' to object to the stop, and may seek to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine . . . ." *Mosley*, 454 F.3d at 253. Here, Davis challenges an illegal seizure of himself by the officers, pursuant to which evidence was discovered in the vehicle. (Davis Mot. ¶¶ 7-9.) Thus, if Davis can establish that he was illegally seized, he has standing to object to any evidence obtained as a result of the illegal seizure, under the fruit of the poisonous tree doctrine. *See Brendlin v. California*, 551 U.S. 249, 258 (2007) (noting that passengers have standing to seek suppression of evidence obtained after an illegal seizure under the fruit of the poisonous tree doctrine); *United States v. Owens*, No. 09-78, 2010 WL 126170, at *4 (M.D. Pa. Jan. 8, 2010) (finding passenger to have standing to challenge his seizures and that, if illegal, evidence obtained as a result of the seizures may be suppressed as the product of the illegal seizures); *United States v. Polanco*, No. 06-39, 2007 WL 218727, at *7 n.4 (D.V.I. Jan. 29, 2007) (same); *see generally Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (noting that generally, evidence seized during an unlawful search and derivative evidence are excluded as

"fruit of the poisonous tree").[8]

### B. The Officers Had Reasonable Suspicion to Stop Defendants and to Search the Jeep[9]

The Fourth Amendment "prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry*, 392 U.S. at 9); *United States v. Cortez*, 449 U.S. 411, 417 (1981). Generally, subject to only a few well-defined exceptions, warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment." *United States v. Ross*, 456 U.S. 798, 825 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967). However, when a police officer has "a reasonable, articulable

---

[8] We have concluded that Officer Gilliam and Officer Witherspoon did not violate the constitutional rights of these Defendants in any respect. Thus the standing issue is of little consequence.

[9] "Before even addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] seized by the police within the meaning of the Fourth Amendment." *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quotation marks omitted; alterations in original). "[T]he Supreme Court has held that for there to be a seizure, either the police must apply physical force to the person being seized, or the person must submit to an assertion of police authority." *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (citing *California v. Hodari D.*, 499 U.S. 621, 626-28 (1991)). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin*, 551 U.S. at 254 (citing *Hodari D.*, 499 U.S. at 626 n.2); *see also United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("[I]f police make a show of authority and the suspect does not submit, there is no seizure.").
   Blackshear contends that the officers' stop of Defendants after they exited the Jeep constituted "not merely an investigatory encounter but involved a full-fledged search" for which the officers needed probable cause. (Blackshear Br. 6, ECF No. 49.) We disagree. When Defendants exited the Jeep, the police officers made an investigatory stop based upon reasonable suspicion. The pat-down of Defendants was perfectly reasonable based upon the totality of the circumstances. The arrest of Defendants after Officer Witherspoon observed the firearm in the Jeep was clearly based on probable cause.

suspicion that criminal activity is afoot," he or she may conduct a "brief, investigatory stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "Reasonable suspicion" requires less than probable cause, but there must be "at least a minimal level of objective justification for making the stop." *Id.*

In determining whether there was reasonable suspicion, we consider the totality of the circumstances, i.e., "the whole picture." *Cortez*, 449 U.S. at 417. Among the "pertinent factor[s]" that an officer may consider are whether the area is a high-crime area, a suspect's "nervous, evasive behavior" and flight from police officers. *Wardlow*, 528 U.S. at 124. Officers may also draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *Cortez*, 449 U.S. at 418; *see also Arvizu*, 534 U.S. at 273; *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). It is not necessary that the suspect actually have done or is doing anything illegal; reasonable suspicion may be "based on acts capable of innocent explanation." *Valentine*, 232 F.3d at 356. The circumstances, however, "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U.S. at 418. Reasonable suspicion "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

Defendants argue that Officer Gilliam's and Officer Witherspoon's observations of Defendants' actions in the Jeep were insufficient to justify stopping and investigating Defendants upon their exit from the vehicle. (Davis Mot. ¶¶ 4-5; Blackshear Br. 2-3.) However, a review of the record demonstrates that by the time Officers Gilliam and Witherspoon approached

13

Defendants, they certainly had reasonable suspicion to stop Defendants and investigate further. Based upon their observations, the officers considered a number of factors and made determinations based on their years of experience as police officers. Initially, both officers observed Defendants in the 5100 Block of Market Street, a high-crime area where robberies, thefts and hand-to-hand narcotics trafficking occurs on the streets, including in vehicles parked on the streets, at all hours of the day. Officer Gilliam then witnessed Defendants conversing with and then reaching toward each other, engaging in motions consistent with a narcotics transaction. In addition, when Defendants looked up and saw the patrol car, they had shocked expressions on their faces, and they quickly reached toward the backseat of the Jeep as if tossing something there. Taken together, these facts provided the officers with reasonable suspicion. The officers' suspicion was strengthened when Defendants exited the Jeep in a hurried fashion leaving the driver's side door partially open and attempted to quickly leave the area.

Considering these facts along with the large bulges which the officers observed in Defendants' pockets, the officers reasonably believed that criminal activity was afoot and that there was the potential of a threat to their safety. As a result, the officers conducted an investigatory stop of Defendants and patted them down. Upon finding what felt like a large wad of cash on both Defendants, Officer Witherspoon placed Davis, uncuffed, in the back of the patrol car.[10] The pat-down and brief detention of Davis in the back of the patrol car as Officers

---

[10] The mere placement of Davis in the rear of the patrol car did not transform the investigatory stop into an arrest. Rather, this detention was part of a routine *Terry* stop, intended only to provide the police officers with an opportunity to continue their investigation. *See United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (noting that a *Terry* stop does not become an arrest simply because a suspect is not free to leave as "in neither a stop nor an arrest is a suspect free to leave"); *see also United States v. Leal*, 235 F. App'x 937, 942 (3d Cir. 2007) (upholding detention where suspect was not free to leave until a canine unit arrived to complete the

Gilliam and Witherspoon continued their investigation was reasonable under the circumstances. The temporary detention of Defendants was particularly reasonable in light of the heightened suspicion of the officers that Defendants had engaged in a narcotics transaction and their knowledge that weapons or firearms are typically associated with such transactions. *See United States v. Wade*, 09-462, 2010 WL 1254263, at *4-5 (E.D. Pa. Mar. 29, 2010) (finding stop of defendant constitutionally permissible because of specific, articulable facts grounding reasonable suspicion, including high-crime area and defendant's nervousness upon officer's approach); *United States v. Walker*, No. 05-440-11, 2008 WL 4367524, at *5 (E.D. Pa. Sept. 23, 2008) (finding pat-down, handcuffing and placement of defendant in rear of police car reasonable in light of detectives' concern for their safety in completing their investigation).

Officer Witherspoon initially looking into the front seat of the Jeep to ensure the officers' safety was also reasonable under the circumstances. An officer conducting a *Terry* stop of a vehicle "may pat down the occupants of the vehicle and conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed and dangerous." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983)). Because Officers Gilliam and Witherspoon had reason to believe that Defendants were engaged in a narcotics transaction and that such transactions are frequently associated with guns, Officer Witherspoon's examination of the Jeep for safety reasons was justified. *See United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe that a person may be armed and dangerous when the person is suspected

---

investigation).

of being involved in a drug transaction.") (citations omitted).

### C. The Officers Had Probable Cause to Arrest Defendants and to Search the Jeep

"Police have probable cause to arrest if the circumstances are sufficient to cause a prudent person to believe that a crime has been committed and the person to be arrested committed it." *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002). "The information obtained as a result of observation of an object in plain sight may be the basis for probable cause or reasonable suspicion of illegal activity. In turn, these levels of suspicion may, in some cases . . . justify police conduct affording them access to a particular item." *Texas v. Brown*, 460 U.S. 730, 739 n.4 (1983).

The officers' reasonable suspicion ripened into probable cause to arrest once Officer Witherspoon saw the handgun in the Jeep. *See Wade*, 2010 WL 1254263, at *5 (finding defendant's arrest constitutionally permissible because after defendant exited the car but before he was frisked, officer saw handgun in plain view on the seat that defendant had occupied); *see also United States v., Bond*, 173 F. App'x 144, 146 (3d Cir. 2006) (holding that an officer "has probable cause to arrest an individual for violation of [Pennsylvania's handgun licensing statute] based solely on the officer's observation that the individual is in possession of a firearm on the streets of Philadelphia") (citing *Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996)); *United States v. Rose*, No. 08-569, 2009 WL 2230749, at *5 (E.D. Pa. July 24, 2009) (finding that reasonable suspicion transformed into probable cause to arrest once officers saw handgun fall from the defendant after fleeing from vehicle).[11]

---

[11] As Officer Witherspoon testified, because the Jeep's two side windows closest to the rear of the vehicle were tinted, he could not determine whether anyone remained inside the Jeep.

Officers may search a vehicle subsequent to a lawful arrest where it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, --- U.S. --- , 129 S. Ct. 1710, 1719 (2009). Here, the totality of circumstances—the sequence of events consisting of an apparent hand-to-hand transaction in a high-crime neighborhood, followed by a look of shock on Defendants' face upon noticing the police officers' presence in close proximity, followed by an apparent throwing motion of an object into the rear of the vehicle, followed by Defendants' hurried exit from the Jeep and Blackshear's failure to close the driver's side door, followed by discovery of a handgun in the vehicle in plain view—provided Officers Gilliam and Witherspoon with probable cause to believe that contraband relating to a narcotics transaction was inside the Jeep. *See United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (finding that because the task force observed defendant leave what they thought to be a drug deal and place the fruits of that transaction in the trunk of the vehicle, probable cause existed to conclude that the vehicle itself was involved in an illegality, regardless of defendant's seizure).

---

Concerned for his safety, Officer Witherspoon opened the front driver's side door further so that he could see more clearly into the rear of the vehicle to determine whether there were other occupants in the vehicle. He then observed the silver and black handgun in plain view. Officer Witherspoon testified that he could see the gun as he stood outside of the vehicle. (Sept. 6 Hr'g Tr. 96-102.) Opening further an already-ajar door of a vehicle is proper conduct in an investigatory stop where an officer is concerned with his safety. Officer Witherspoon's concern for safety was reasonable in light of the factual circumstances here and his resulting suspicion that criminal activity was afoot. Since opening the door further was proper conduct, the subsequent seizure of the gun did not violate the Fourth Amendment. *See, e.g.*, *United States v. Stallings*, No. 09-368, 2010 WL 653537, at *6-7 (E.D. Pa. Feb. 22, 2010) (finding that officers properly seized a handgun in an investigatory stop because the officers "did not violate the Fourth Amendment in arriving at the place from which the [gun] could be plainly viewed") (citing *United States v. Yamba*, 506 F.3d 251, 256 (3d Cir. 2007)).

### D. The Search Warrant Had Sufficient Factual Basis to Establish Probable Cause

After Officers Gilliam and Witherspoon recovered the handgun from the Jeep and saw the clear bag that appeared to contain cocaine in the rear of the vehicle, and after the drug sniffing K-9 alerted positive for the presence of illegal drugs in the Jeep, Philadelphia police detectives obtained a warrant to search the Jeep. Upon executing the warrant, the detectives seized cocaine and other items, including approximately ten cellular phones, a pair of binoculars and paperwork. Defendants contend that the warrant that was issued in this case "was based on perceived illegal activity that was obtained only as a consequence of unconstitutional police activity," and since the information that served as the basis for the issuance of the warrant was "illegally obtained," anything seized pursuant to the execution of the warrant must be suppressed. (Blackshear Br. 4.) Defendants are simply wrong.

As discussed above, the police officers acted properly in this case. There was no unconstitutional police activity. The police officers had reasonable suspicion based upon their observations of the conduct of Defendants. The investigatory stop and pat-down of Defendants were proper. The observation of the handgun in the vehicle and the positive alert of the drug-sniffing dog provided probable cause for the arrest of Defendants and probable cause for the issuance of the search warrant for the vehicle.

IV.  **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Suppress Physical Evidence is denied.

An appropriate Order follows.

> BY THE COURT:
>
> _____
> **R. BARCLAY SURRICK, J.**